IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
June 28, 2017 Session

## THE GERMANTOWN MANOR HOMEOWNERS ASSOCIATION, INC. v. GGAT DEVELOPMENT CORP., ET AL.

**Appeal from the Circuit Court for Shelby County**
**No. CT-000239-15  Felicia Corbin Johnson, Judge**

_____

### No. W2016-01461-COA-R3-CV

_____

Appellee, homeowner's association, filed suit against Appellants, owners of lots in the development, to collect association fees. The trial court held that Appellee, a non-profit corporation, was not authorized to formally assess association fees until it elected a board of directors. Tenn. Code Ann. § 48-58-101. The trial court charged Appellants' with association fees accruing after the election of the board and also denied Appellants' counter-complaint for quantum meruit damages allegedly accrued for upkeep of certain common areas, which remained under Appellants' ownership. Discerning no error, we affirm and remand.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded

KENNY ARMSTRONG, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and BRANDON O. GIBSON, J., joined.

Robert W. Reid and Eugene G. Douglass, Jr., Bartlett, Tennessee, for the appellants, GGAT Development Corporation, and Charleston II Builders, Inc.

Brandon F. McNary and Peter D. Baskind, Memphis, Tennessee, for the appellee, The Germantown Manor Homeowners Association, Inc.

### OPINION

### I. Background

Germantown Manor consists of 29 lots, which were all initially owned by William

Tagg, who is the sole shareholder of Charleston II Builders, Inc. ("Charleston II") and GGAT Development Corporation ("GGAT," and together with Charleston II, "Appellants"). Charleston II owns two of the 29 Germantown Manor lots; GGAT owns twelve lots and certain common areas. The original plat for Germantown Manor was filed with the Shelby County Registrar on November 14, 2005; the plat contains the following, relevant provision:

> 19. All lot owners shall become members of the Germantown Manor Homeowners Association and shall pay dues as set by its members and shall comply with the Germantown Manor Home Owners Association's bylaws and regulations. The holder or holders of fee simple title of each lot in this subdivision shall be a fee simple "owner" with one vote.

From approximately 2004 to 2008, Bud Hurley, a Germantown Manor homeowner, informally collected association fees from other homeowners (not lot owners).[1] In 2008, Mr. Hurley moved from Germantown Manor, and the task of collecting association fees fell to another homeowner, Misty Patel. It was at this time that the homeowners decided to formally organize the Germantown Manor Homeowners Association ("Association," or "Appellee"). To this end, Ms. Patel met with a local attorney, and the Association filed its Corporate Charter with the Tennessee Secretary of State on March 25, 2008. The Charter was filed pursuant to Tennessee Code Annotated Section 48-52-102; however, no board members were identified in the Charter. On or about April 23, 2008, after the Charter was filed, Ms. Patel sent a letter to the homeowners (not lot owners), stating that the Association had been incorporated and calling for a meeting on April 26, 2008. The meeting was subsequently rescheduled for May 3, 2008.

On or about August 15, 2008, a second letter was sent to the homeowners (not lot owners), inviting them to attend a special meeting called for August 25, 2008. The purpose of the August 25, 2008 meeting was to discuss proposed bylaws and a proposed declaration of covenants, restrictions, and conditions for the Association. The meeting notice made no mention of establishing an annual assessment to be paid by all lot owners. At the August 25, 2008 meeting, Wayne Mink (an attorney) discussed proceeding with the enactment of formal bylaws, covenants, assessments, and liability issues related to the common areas. At the August 25, 2008 meeting, the homeowners voted to begin collecting homeowner association assessments in the amount of $750.00 per year effective January 1, 2009. Importantly, the Association members did not hold an election of board members at either of the 2008 meetings.

---

[1] The terms, "association fees," "fees," "dues," and "assessments" are used interchangeably throughout the opinion.

In September of 2008, Attorney Mink sent a letter to Mr. Tagg discussing issues with the development, including the possibility of an arrangement by which Charleston II could be exempt from assessments under the new covenants, conditions, and restrictions for Germantown Manor. Mr. Mink testified that Mr. Tagg contacted him shortly after he received the letter to discuss his concerns. Mr. Mink sent Mr. Tagg a second letter on or about September 24, 2008, referencing the discussion. The second letter included proposed covenants, conditions and restrictions, and indicated that the documents would, *inter alia*, exempt Mr. Tagg and his related entities from assessments. The letter also included a quit claim deed for conveyance of the common areas (held by GGAT) to the Association. Mr. Tagg allegedly did not agree with the proposed covenants, conditions, and restrictions, and did not execute and return the quit claim deed.

In January of 2009, the Association began to collect assessments formally. Despite allegedly receiving bills for assessments, neither Mr. Tagg nor his entities paid association fees. The Association did not hold a meeting in 2009, 2010, 2011, 2012, or 2013. On June 23, 2014, the Association mailed notice of a June 23, 2014 meeting to its members. It was not until the June 23, 2014 meeting that a quorum of the Association members elected a board of directors.

On January 20, 2015, the Association filed, in the Circuit Court for Shelby County ("trial court"), a complaint for breach of contract against GGAT, seeking damages for unpaid association fees. On January 29, 2015, the Association filed a civil warrant in the Shelby County General Sessions Court against Charleston II. The Association received a judgment against Charleston II in the general sessions court and appealed the judgment to the trial court. On September 14, 2015, the trial court entered a consent order, consolidating the two cases into the present action. By its complaint, the Association sought damages, against GGAT and Charleston II, for unpaid homeowners association fees dating back to 2009. On April 4, 2015, GGAT filed an answer and counter-complaint, seeking compensation for amounts it claimed were incurred in maintaining certain common areas at Germantown Manor.

The trial was held on April 29 and May 3, 2016. By order of June 20, 2016, the trial court awarded the Association a judgment against Charleston II in the amount of $1,800 and awarded the Association a judgment against GGAT in the amount of $10,800. The trial court awarded the Association its assessments dating no earlier than 2014, concluding that the Association's board of directors was not empowered to act before that time. The trial court denied GGAT's counterclaims, finding that it had failed to satisfy the requirements for recoupment of *quantum meruit* damages.

- 3 -

## II. Issues

Appellants appeal, raising nine issues as stated in their brief:

1. Whether the trial court erred in assessing dues from January 2015 up to and including January 2016 against Charleston II in the amount of $1,800.00?

2. Whether the trial court erred in assessing dues from January 2015 up to and including January 2016 against GGAT in the amount of $10,800.00?

3. Whether the trial court erred in finding that The Germantown Manor Homeowners Association was properly incorporated and organized?

4. Whether the trial court erred in finding that Charleston II and GGAT are members of The Germantown Manor Homeowners Association by virtue of Paragraph 19 of the Plat?

5. Whether the trial court erred in finding that The Germantown Manor Homeowners Association elected a valid board of directors on June 23, 2014?

6. Whether the trial court erred in finding that Charleston II received notice of meetings and bills beginning in 2008?

7. Whether the trial court erred in finding that GGAT received notice of meetings and bills beginning in 2008?

8. Whether the trial court erred in finding that GGAT received inquiry notice by virtue of the fact that a separate and distinct corporate entity, Charleston II, received notice of bills and meetings?

9. Whether the trial court erred in dismissing Appellants' Counter-Complaint for recoupment based o[n] quantum meruit?

Appellee raises the following, additional issues for review:

1. Whether the trial court erred by failing to find that Charleston II Builders, Inc. owed homeowner association assessments beginning in January, 2009?

2. Whether the trial court erred by failing to find that GGAT Development Corp. owed homeowner association assessments beginning in January, 2009?

3. Whether the trial court erred by failing to find that the Association was properly organized in 2008?

We perceive that there are three dispositive issues in this appeal, which we state as follows:

1. Whether the trial court erred in finding that GGAT and Charleston II were bound by Paragraph 19 of the Germantown Manor Plat.

- 4 -

2. If so, whether the trial court erred in calculating the date when GGAT and Charleston II were required to pay association fees.
3. Whether the trial court erred in dismissing Appellant's Counter-Complaint for quantum meruit damages.

### III. Standard of Review

Because this case was tried by the court sitting without a jury, we review the trial court's findings of fact de novo with a presumption of correctness, unless the evidence preponderates against those findings. *McGarity v. Jerrolds*, 429 S.W.3d 562, 566 (Tenn. Ct. App. 2013); *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006). For the evidence to preponderate against a trial court's finding of fact, the weight of the evidence must "demonstrate... that a finding of fact other than the one found by the trial court is more probably true." *Williams v. City of Burns*, 465 S.W.3d 96, 108 (Tenn. 2015); *The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999). This Court conducts a de novo review of the trial court's resolution of questions of law, with no presumption of correctness. *Kelly v. Kelly*, 445 S.W.3d 685, 691-92 (Tenn. 2014); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013).

### IV. Analysis

### A. Applicability of Paragraph 19 of the Plat

As set out in context above, Paragraph 19 of the original plat for Germantown Manor states that "[a]ll lot owners shall become members of the Germantown Manor Homeowners Association and shall pay dues as set by its members." The type of restriction set out in the Germantown Manor plat was discussed by this Court in *Maples v. Homeowners Ass'n v. T & R Ltd. P'ship*, to wit:

> Covenants, conditions, and restrictions . . . are property interests that run with the land. *See Turnley v. Garfinkel*, 211 Tenn. 125, 130, 362 S.W.2d 921, 923 (1962). They arise, however, from a series of overlapping contractual transactions. *See* Restatement (Third) of Property: Servitudes § 4.1 cmt. c (Tentative Draft No. 4, 1994). Accordingly, they should be viewed as contracts, *see Clem v. Christole*, 582 N.E.2d 780, 782 (Ind. 1991); *Russell v. Williams*, 964 P.2d 231, 234 (Okla. Ct. App.1998); *Houck v. Rivers*, 316 S.C. 414, 450 S.E.2d 106, 108 (1994); *Shafer v. Board of Trustees of Sandy Hook Yacht Club Estates, Inc.*, 76 Wash. App. 267, 883 P.2d 1387, 1392-93 (1994), and they should be construed using the rules of construction generally applicable to the construction of other contracts. *See Xinos v. Village of Oak Brook*, 298 Ill.App.3d 520, 232 Ill. Dec. 576, 698 N.E.2d 667, 669 (1998); *Hoag v. McBride & Son Inv. Co.*, 967 S.W.2d 157, 169 (Mo. Ct. App. 1998); *Toavs v. Sayre*, 281

Mont. 243, 934 P.2d 165, 166 (1997); *Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex.1998).

> The courts enforce restrictions according to the clearly expressed intentions of the parties manifested in the restrictions themselves. *See Lapray v. Smith*, 804 S.W.2d 87, 89 (Tenn. Ct. App. 1990); *Benton v. Bush*, 644 S.W.2d 690, 691 (Tenn. Ct. App. 1982). We give the terms used in restrictions their fair and reasonable meaning, *see Parks v. Richardson*, 567 S.W.2d 465, 467-68 (Tenn. Ct. App. 1977), and we decline to extend them beyond their clearly expressed scope. *See Central Drug Store v. Adams*, 184 Tenn. 541, 545-46, 201 S.W.2d 682, 684 (1947); *Hamilton v. Broyles*, 57 Tenn. App. 116, 123-24, 415 S.W.2d 352, 355 (1966). We also construe the terms of a restriction in light of the context in which they appear. *See Hillis v. Powers*, 875 S.W.2d 273, 276 (Tenn. Ct. App. 1993).

> When the restriction's terms are capable of more than one construction, we should adopt the construction that advances the unrestricted use of the property. *See Southern Advertising Co., Inc. v. Sherman*, 43 Tenn. App. 323, 327, 308 S.W.2d 491, 493 (1957). We should also resolve ambiguities in the restrictions against the party who drafted them, *see Maxwell v. Land Developers, Inc*., 485 S.W.2d 869, 874 (Tenn. Ct. App. 1972), and finally we should resolve all doubts concerning a covenant's applicability against applying the covenant. *See Richards v. Abbottsford Homeowners Ass'n*, 809 S.W.2d 193, 195 (Tenn. Ct. App. 1990).

*Maples v. Homeowners Ass'n v. T & R Ltd. P'ship*, 933 S.W.2d 36, 38-39 (Tenn. Ct. App. 1998).

In its June 20, 2016 order, the trial court held that, "[b]y virtue of Paragraph 19 of the Plat, Mr. Tagg contemplated that each lot owner would become a member of the Germantown Manor Homeowners Association, that each member would pay dues, and [would] comply with the bylaws or regulations of the Association." In their brief, Appellants state that, "[b]y providing no notice or at the very least insufficient notice [notice is discussed below], Appellee attempted to force owners of Germantown Manor, including Appellants, to become members of an association they otherwise would not be legally bound to join." In the first instance, the plain language of Paragraph 19 states that "[a]ll lot owners **shall** become members of the Germantown Manor Homeowners Association" (Emphasis added). This language is not ambiguous. To become a member of the association, a party need only be the owner of a lot. Ownership of a lot automatically enrolls the owner of the lot as a member of the Association without further action. It is undisputed that, at all relevant times, Charleston II owned two of the 29 Germantown Manor lots, and GGAT owned twelve lots. As the "owner" of these lots, both Charleston II and GGAT are "members" of the Association, i.e., "[a]ll lot owners shall become members of the Germantown Manor Homeowners Association." As

- 6 -

"members" of the Association, under the plain language of Paragraph 19, both Charleston II and GGAT are obligated to pay association fees so long as those fees are properly set (*see* discussion *infra*). Accordingly, we cannot conclude that the trial court erred in holding that Charleston II and GGAT, as members of the Association, were obligated to pay association fees. We now turn to the question of whether the trial court erred in its calculation of the date on which Charleston II and GGAT's respective association fees began to accrue.

## B. Date of Assessment of Association Fees

Paragraph 19 of the Germantown Manor Plat further states that the association fees will be "set by [Association] members (i.e., lot owners) and shall comply with the Germantown Manor Home Owners Association's bylaws and regulations. The holder or holders of fee simple title of each lot in this subdivision shall be a fee simple 'owner' with one vote." In its final order, the trial court held that "Paragraph 19 of the Plat does not state a specific amount of dues to be assessed and does not by itself implicitly or explicitly create lot owner liability for dues." Had the Association never been incorporated, Paragraph 19 may have been sufficient to create a contractual obligation for members to pay assessments (*see* discussion *supra*), but this argument was not raised in the trial court, and the Association does not seek association fees, from Appellants, accruing earlier than January of 2009. It is undisputed that the Association filed its Charter with the State on March 25, 2008. It is also undisputed that, at least up to the date of the hearing in this case, the Association had not passed bylaws, covenants, or regulations. As such, from the date of its incorporation, i.e., March 25, 2008, the operation of the Association was governed by the Tennessee Non-Profit Corporation Act, Tennessee Code Annotated Section 48-51-101, *et seq.* (the "Act").[2]

Tennessee Code Annotated Section 48-58-101 of the Act provides that:

(a) Each corporation must have a board of directors.
(b) Except as provided in subsection (c), all corporate powers shall be exercised by or under the authority of, and the affairs of the corporation managed under the direction of, its board.
(c) The charter may authorize a person or persons to exercise some or all of the powers which would otherwise be exercised by a board. To the extent so authorized, any such person or persons shall have the duties and responsibilities of the directors, and the directors shall be relieved to that extent from such duties and responsibilities.[3]

---

[2] Because Appellees do not seek payment of association fees that Appellants may have accrued prior to the date of incorporation of the Association, we will not address whether the Plat obligated payment of association fees prior to the March 25, 2008 date of incorporation.

[3] There is no dispute or argument that the Association's Charter authorized any person or persons to exercise any power designated to the board under the Act.

Appellants' argument on appeal focuses primarily on the question of notice and, specifically, whether the Association failed to give proper notice to Appellants of the meetings, at which the board was elected and/or association fees were set. *See* Tenn. Code Ann. § 48-57-105. However, the trial court's disposition of the case does not rest on the question of notice. Rather, the trial court determined that any action by the Association regarding fee assessments was invalid until after it elected its board of directors. Specifically, the trial court held that:

> 33. New board members were validly elected at the June 23, 2014 meeting.
> 34. All Association actions conducted prior to the formal election of the Board of Directors were invalid as to [Appellants], including the assessment of dues.
> 35. The Board's actions after the June, 2014 meeting were valid.

The trial court's order further notes that "Charleston II received notice of meetings and bills beginning in 2008," and "GGAT received notice of meetings and bills beginning in 2014." However, regardless of whether Appellants received proper notice of the meetings, any action taken in those meetings, which were held after incorporation but prior to the election of the board of directors, was not binding under Tennessee Code Annotated Sections 48-58-101(a) and (b). Accordingly, Appellants cannot be held liable for association fees for any period of time before the Association elected its board of directors, and this is what the trial court ultimately held:

> 41. GGAT is liable for assessments in the amount of . . . $10,800.00, for the January, 2015 assessments, July, 2015 assessments, and January, 2016 assessments.
>
> 42. Charleston II is liable for assessments in the amount of . . . $1,800.00, for the January, 2015 assessments, July, 2015 assessments, and the January, 2016 assessments.

Although the board of directors was empaneled in 2014, Appellants argue that "the trial court erred in finding that Charleston II received notice of meetings and bills beginning in 2008 and [in] finding that GGAT received notice of the same beginning in 2014." Appellants concede that they received "billing notices," but argue that "[b]illing notices do not, in and of themselves, provide notice of Association meetings nor do they impart liability for dues on Appellants." The type of notice underlying Appellants' argument is notice as to the actions taken by the board, i.e., notice of the election of the board and the board's decision to collect association fees. Specifically, because Appellants owned the majority of the lots in the development, they contend that their votes were usurped when the board was empaneled and voted to assess fees without first giving notice of those actions such that Appellants could attend the meetings and vote. This argument goes directly to the incorporated Association's authority to act through its

board of directors.  As such, the Act provides only one means of recourse—a derivative proceeding brought in the right of the corporation:

> (a) Except as provided in subsection (b), the validity of corporate action may not be challenged on the ground that the corporation lacks or lacked power to act.
> (b) A corporation's power to act may be challenged in a proceeding against the corporation to enjoin an act . . . .  The proceedings may be brought by . . . a member or members in a derivative proceeding.

Tenn. Code Ann § 45-53-104; *see also* Tenn. Code Ann. § 48-56-401.

As "members" of the Association, pursuant to Paragraph 19 of the Plat (*see* discussion *supra*), with at least 5% or more of the voting power, Tenn. Code Ann. § 48-56-401(a)(1), Appellants had standing to bring a derivative proceeding to contest the authority of the board of directors to act on the ground that the board was improperly elected in the absence of notice to all lot owners/members.  However, Appellants did not file a derivative action in this case.  Appellants' counter-complaint, as discussed below, is only for quantum meruit damages.  Nonetheless, Appellants contend that the allegations contained in their answer and counter-complaint make out a derivative claim.  The trial court addressed this argument in its oral ruling on Appellants' motion for involuntary dismissal:

> Counsel, it's not a derivative suit.  I mean, a derivative proceeding—and I've looked at [Appellants'] counter-complaint.  I've looked at [Appellants] answer.  A derivative suit has to be brought in the name of the corporation.  Now, [Appellants'] counter-complaint was brought in the name of GGAT and . . . Charleston II . . . ."
>
> ***
>
> So a derivative lawsuit is—the statute very clearly addresses what the Tennessee legislature intended by derivative lawsuits. . . .  So the code [citing Tenn. Code Ann. §48-56-401] sets out . . . a process where the action is brought by a member. . . in the name of the corporation . . . because . . . it's on behalf of the corporation.

We agree with the trial court that derivative actions must follow specific conventions, including: (1) alleging, with particularity, the demand on the corporation; (2) verification of the complaint, and (3) brought in the right of the corporation.  As this Court has instructed:

Tennessee's corporation statutes and [] the procedural rules governing derivative actions, Tenn. Code Ann. § 48-17-401(b) (1988) [currently Tenn. Code Ann. §48-17-401(c)], requires that

> [a] complaint in a proceeding in the right of a corporation must be verified and allege with particularity the demand made, if any, to obtain action by the board of directors and either that the demand was refused or ignored or why he did not make the demand.

Similarly, Tenn. R. Civ. P. 23.06 requires that

> [t]he complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort.

*Lewis on Behalf of Citizens Sav. Bank & Trust Co. v. Boyd*, 838 S.W.2d 215, 221-22 (Tenn. Ct. App. 1992). Additionally, as noted by the trial court, a derivative action is brought on behalf of the corporation to redress injury sustained by, or to enforce a duty owed to, the corporation. *See, e.g., Keller v. Estate of McRedmond*, 495 S.W.3d 852, 867-68 (Tenn. Ct. App. 2016).

Liberal interpretation of the averments in pleadings has long been the rule in Tennessee. *See, e.g., Lazarov v. Nunnally*, 217 S.W.2d 11 (Tenn. 1949); *Read v. Memphis Gayoso Gas Co.*, 56 Tenn. 545, 550 (Tenn. 1872). However, even applying the most liberal interpretation to Appellants' answer and counter-complaint, it is clear that Appellants have not satisfied the statutory requirements for a derivative action. Because a derivative proceeding is the sole recourse for Appellants to contest the authority of the board of directors to act, Appellants cannot challenge the board's assessment of association fees absent a properly pled derivative action. Tenn. Code Ann. § 48-53-404(b).

### C. Quantum Meruit Damages

A quantum meruit action is an equitable substitute for a contract claim pursuant to which a party may recover the reasonable value of goods and services provided to another if the following circumstances are shown:

(1) There is no existing, enforceable contract between the parties covering the same subject matter;
(2) The party seeking recovery proves that it provided valuable goods or services;

(3) The party to be charged received the goods or services;

(4) The circumstances indicate that the parties to the transaction should have reasonably understood that the person providing the goods or services expected to be compensated; and

(5) The circumstances demonstrate that it would be unjust for a party to retain the goods or services without payment.

*Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 197-98 (Tenn. 2001) (quoting *Swafford v. Harris*, 967 S.W.2d 319, 324 (Tenn. 1998)).

In its counter-claim, GGAT states, in relevant part:

COMES NOW the Defendant, GGAT Development Corp., who now assumes the role of Counter-Plaintiff and would state as follows:

\*\*\*

2. Counter-Plaintiff has maintained the common areas in the subdivision by cutting grass from the completion of the subdivision in every month necessary since March, 2008.

3. The plat calls for the [Association] to assume responsibility of the design and review of the new completed plans, take title, pay taxes of the common areas and maintenance of common areas and said [Association] has failed to do so and has breached its duties. A reasonable cost of cutting the grass alone when necessary would be approximately $2,800.00 annually. Counter-Plaintiff has cut the grass and otherwise maintained the common areas since 2008 and has expended approximately $19,600.00 which has damaged Counter-Plaintiff and benefitted [the Association].

Importantly, the counter-claim for quantum meruit damages was brought in the name of GGAT, and Mr. Tagg is not listed as a counter-plaintiff to the action. However the evidence indicates that Mr. Tagg, as opposed to GGAT, performed the maintenance on the common areas. Mr. Tagg testified that he uses his own lawn equipment to cut the grass and trim the common spaces, pays for said equipment and fuel, and even hires another contractor when he is unable to do so. In its June 20, 2016 order, the trial court found, in relevant part, that:

45. Mr. Tagg, on behalf of GGAT and/or Charleston II, was maintaining some of the common areas and cutting grass.
46. Mr. Tagg, on behalf of GGAT and/or Charleston II, voluntarily took it upon himself to maintain the common areas.

- 11 -

Because Mr. Tagg undertook to mow the common areas, the trial court held that GGAT could not satisfy the fourth criterion for quantum meruit damages, i.e., "the parties to the transaction should have reasonably understood that the person providing the goods or services expected to be compensated." The record does not preponderate against this holding.

Furthermore, although the plat specifies that "[a]ll common open space [will be] owned and maintained by the Homeowner's Association," as discussed above, Mr. Tagg has not transferred the common areas to the Association. Therefore, these areas remain under the ownership of GGAT and Charleston II. Having declined to transfer ownership of the common areas to the Association, it is illogical that Mr. Tagg, or his entities, should expect compensation for maintenance and upkeep of lots they own. Because GGAT has not met its prima facie case for recovery under the theory of quantum meruit, we conclude that the trial court properly denied its counter-petition.

## V. Conclusion

For the foregoing reasons, we affirm the order of the trial court. The case is remanded to the trial court for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed against the Appellants, GGAT Development Corporation, Charleston II Builders, Inc., and their surety, for all of which execution may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE